**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------x

ALLIED WORLD SURPLUS LINES
INSURANCE COMPANY,

        Plaintiff,

  -against-

ELAMEX USA, CORP. and MOUNT
FRANKLIN FOODS LLC,

        Defendants.
--------------------------------------------------------x

**COMPLAINT FOR**
**DECLARATORY JUDGMENT**

**Civil Action No.:**

**JURY TRIAL REQUESTED**

Plaintiff Allied World Surplus Lines Insurance Company ("Allied World") by and through its undersigned counsel, alleges, upon information and belief, and pursuant to 28 U.S.C. §§2201(a) and 2202 and Federal Rule of Civil Procedure 57, for its complaint against Defendants Elamex USA, Corp. ("Elamex") and Mount Franklin Foods, LLC ("MFF") (collectively, the "Defendants), as follows:

## THE PARTIES

1.    Allied World is an insurance company organized under the laws of the State of Arkansas with a principle place of business at 199 Water Street, New York, NY 10038.

2.    Elamex is a corporation organized under the laws of the State of Delaware with a principle place of business in the State of Texas.

3.    MFF is a limited liability company organized under the laws of the State of Texas with a principle place of business in Texas.

4.    MFF is a subsidiary of Elamex and no member of MFF is a resident of the State of Arkansas or the State of New York.

## JURISDICTION AND VENUE

5.    The Court has personal jurisdiction over the Defendants because they have transacted with a company located in New York and this dispute arises out of that transaction.

6. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that it arises between citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, insofar as the value of the right being protected and/or the injury being alleged exceeds $75,000..

7. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims for relief occurred in this district.

## FACTUAL BACKGROUND

8. In this insurance coverage action, Allied World seeks a judgment declaring that the Allied World Surplus Lines Insurance Company Product Contamination Policy – Food and Beverage, bearing Policy Number 0313-1706, issued by Allied World to Elamex for the period of December 1, 2021, to December 1, 2022, (the "Policy") does not afford coverage to the Defendant with respect to its claim arising out of metal contamination in various food products that Elamex manufactured for Mars Incorporated ("Mars").

### The Application and the Policy

9. In order to obtain the Policy, Allied World required Elamex to provide an Application on behalf of itself and its subsidiaries.  Question 67 of the Application for the Policy, submitted on October 29, 2021, asked if "the Applicant, its principal(s), partner(s), officer(s), director(s) or manager(s) have knowledge or information of any current situation or circumstance which might lead to a claim under the proposed insurance." The Applicants, including Elamex and MFF, answered "No".

10. By submitting the Application, Elamex and MFF also agreed "that if the information supplied on this application changes between the date the application is executed and the time the proposed insurance policy is bound or coverage commences, the Insured shall immediately notify the Insured in writing of such changes."

11. Elamex and MFF did not revise their answer to Question 67 before coverage under the Policy commenced.

12. In reliance on the accuracy of the answers in Defendants' Application, Allied World issued the Policy effective December 1, 2021.

13. Allied World issued the Policy to Elamex under Policy No. 0313-1706, which was in effect from December 1, 2021 to December 1, 2022. MFF is an additional Named Insured under the Policy per Endorsement 8.

14. The Policy contains a Limit of Insurance in the amount of $5,000,000 for Each Incident and in the Aggregate for Accidental Contamination, in excess of a $150,000 Retained Limit. The Policy contains additional Limits and Sublimits of Insurance and additional endorsements.

15. The Policy's Preamble and Insuring Agreement in Section I states:

In consideration of the payment of the premium and in reliance upon the representations and warranties in the Application for this insurance and the statements in the Declarations, we agree to provide coverage as follows:

I. **INSURING AGREEMENT**

    A. We will reimburse you for **Loss** caused by an **Incident** of:

        1. **Accidental Contamination**:

        2. **Malicious Contamination**; or

        3. **Product Extortion**;

        first discovered and reported to us during the **Policy Period**, or within sixty (60) days thereafter.

16. In relevant part, the Policy defines **Incident** to mean:

**Accidental Contamination**, **Malicious Contamination** or **Product Extortion**.

With respect to **Accidental Contamination**, individual contamination or mislabeling events shall be deemed to be one Incident if the same or substantially similar error or introduction of a contaminated ingredient or component causes such contamination.

17. The Policy defines **Accidental Contamination** to mean:

[A]ny inadvertent or unintentional contamination or mislabeling of any **Insured Products**, which occurs during or as a direct result of its production, preparation, manufacture, packaging or distribution, provided that the use or consumption of such **Insured Products** has:

1. resulted in or would result in **Bodily Injury** within three- hundred- sixty-five (365) days following such use or consumption; or

2. caused or would cause physical damage to or destruction of tangible property, other than **Insured Products** themselves.

18. In relevant part, the Policy defines **Insured Products** to mean:

1. Any topical and ingestible products for human consumption or any of their ingredients or components as shown in Item 10. of the Declarations, provided such:
a) are in production by you;

b) have been manufactured, handled or distributed by you;

c) are manufactured by any contract manufacturer for you; or

d) are being prepared for or are available for sale.

19. Per Endorsement 9, Item 10 of the Declarations states:

INSURED PRODUCT(S): All food and beverage, protein powder and protein drinks products produced distributed by the Named Insured.

20. Section III. of the Policy contains the following exclusions:

   C. This policy does not provide coverage for any **Loss** or related **Incident Response Fees** arising out of, in whole or in part, any **Incident** or any circumstance that could give rise to an **Incident**, which you discovered or was known, or should have reasonably been known, prior to the inception of the **Policy Period**.

8

D. The policy does not provide coverage for any **Loss** or related **Incident Response Fees** arising out of, in whole or in part, any **Incident** expected or intended from the standpoint of you or any insured. However, this exclusion D. does not apply to **Malicious Contamination** or **Product Extortion**.

21. Section IV. of the Policy contains the following condition:

N. Mitigation of Loss

As a condition precedent to coverage, you must use take every reasonable action necessary to prevent, mitigate, avoid or diminish any **Loss** covered under this policy or **Incident**.

The Manufacturing Relationship with Mars

22. Elamex, MFF, and Mars had contractual relationships dating back to 2008.

23. In 2017 and 2018, MFF ordered mogul machines, identified as Mogul 1 and Mogul 2, which are used to manufacture food products, in anticipation of the 2020 opening of operations at its San Jerónimo, Mexico facility.

24. On January 1, 2021, Mars and Elamex entered into a Co-manufacturing Agreement ("CMA"), which terminated and replaced the earlier agreements between Mars and Elamex. This CMA governed Elamex's and MFF's manufacturing work for Mars at the San Jerónimo, Mexico facility.

25. Mars and Elamex also entered into Statement of Work #1 under the CMA. Pursuant to this statement of work, MFF agreed to manufacture Mars' starch mogul products at the San Jerónimo, Mexico facility.

26. As relevant here, the CMA states:

7    NON-CONFORMANCE MANAGEMENT
7.1  Non-conformance and corrective actions

*Mars External Manufacturing Quality Associate MUST be notified of all non-conformance (raw material, packaging, WIP and finished good) at point of detection*

Non-conformances related to the raw materials, packaging finished goods or to the process must be managed with immediate effect to enable normal running and to resume running as soon as possible; they must be documented and followed up on to prevent a re-occurrence.

Mars External Manufacturing Quality Associate must be contacted immediately in the case of any food safety risk, legal issue, media attention, product out of our control situations, and whenever the External Manufacturer feels uncertain about the severity/effect of an exception. The External Manufacturer must have confirmation that EMQA has been contacted. All product non-conformances are to be classified by severity by Mars External Manufacturing Quality Associate.

27. The CMA's Technical Specification Part 2 – Industry Specific Requirements (TS 2) provided additional requirements regarding Non-Conformance Management during MFF's manufacture of Mars' products and states:

3. Non-Conformance Management

3.2.1.2. When donor or finished good is non-conforming or may pose a food safety risk, the External Manufacturer must segregate it and inform MWC External Manufacturing Quality Associate, using the non-conformance reporting system. MWC External Manufacturing Quality Associate will conduct a risk assessment and provide final disposition requirements if applicable.

3.2.1.3 Disposal Methods by Product Type

> 3.2.1.3.3    Confections
> In-process product which is a Food Safety risk should be destroyed.

3.3    Non Conformance Reports Process

*MWC External Manufacturing Quality Associate MUST be notified of all non-conformances (raw material, packaging, WIP and finished goods) at point of destruction*

Any non-conformance that affects manufacturing and/or product performance must be documented in an agreed format and reported to the MWC responsible person at point of detection.

This includes all non-conformances, e.g. raw materials, component, packaging, finished products, incorrect delivery, specifications non-compliance, incorrect quality.

The Recall

28. Almost immediately after manufacturing operations on Mogul 2 began, the machine began experiencing problems.

29. Three days after manufacturing began on August 9, 2021, MFF discovered the Mogul 2 had a damaged screen and ordered a replacement, which was not installed until February 28, 2022.

30. In the interim, between August 12, 2021, and October 29, 2021, MFF managers were alerted to a significant number of instances of metal non-conformance or metal contamination in gummy candies.

31. In violation of the CMA, MFF did not notify Mars of any of the metal non-conformance or metal contamination in gummy candies.

32. On October 29, 2021, MFF submitted its insurance application for the Policy.

33. MMF did not disclose or reference these incidents on its insurance application.

34. MFF managers were alerted to at least five additional incidents of metal non-conformance or metal contamination between October 29, 2021, and December 1, 2021, when the Policy began.

35. Throughout the remainder of 2021 and early 2022, many additional instances of metal non-conformances and metal contamination events were discovered by MFF but not reported to Mars.

36. During this time numerous customer complaints were also reported related to metal and wires being found in gummy candies manufactured by MMF on the Mogul 2.

37. On May 13, 2022, Mars conducted a voluntary recall in the United States of certain gummy candies due to the possible presence of metal fragments in these products manufactured by MMF (the "Recall").

38. On Mars subsequently sent a Notice of Claim letter to Defendants seeking recovery of an amount in excess of the Policy's limit of liability in connection with the Recall.

39. MFF and Elamex have tendered notice of the Recall to Allied World and seek recovery under the Policy for approximately $4.975 million.

40. Allied World has notified Elamex and MFF that it was rescinding the Policy and tendering the Policy premium back to Defendants.

### FIRST CAUSE OF ACTION
**(Declaratory Judgment: No Coverage for Defendants' claim for the Recall)**

41. Plaintiff hereby incorporates and re-alleges the preceding allegations as if fully set forth herein.

42. Defendants were aware of numerous metal non-conformance and contamination events, involving Mogul 2 prior to December 1, 2021.

43. Prior to the Policy Period, Defendants knew or should have known that these non-conformance and contamination issues constituted an Accidental Contamination Incident or could give rise to an Incident, as defined in the Policy.

44. Defendants were aware of additional metal non-conformance and contamination incidents involving Mogul 2 for many months prior to May 13, 2022..

45. These metal non-conformance and contamination issues with Mogul 2's production were the direct cause of Mars' recall and the damages for which Defendants seek coverage.

46. Exclusion C in the Policy excludes coverage "[f]or any Loss . . . arising out of, in whole or in part, any Incident or any circumstance that could give rise to an Incident, which [Defendants] discovered or was known, or should have reasonably been known, prior to the inception of the Policy Period [December 1, 2021]."

47. Because Defendants were aware of the non-conformance and contamination issues with Mogul 2 before December 1, 2021, and because those issues gave rise to Defendants' present claim, there is no coverage under the Policy pursuant to Exclusion C.

48. The Policy's Condition N provides that, "[a]s a condition precedent to coverage, you must use take every reasonable action necessary to prevent, mitigate, avoid or diminish any Loss covered under this policy or Incident."

49. Although Defendants were aware of the non-conformance and contamination issues with Mogul 2 long before the Recall, issues which gave rise to Defendants' present claim, they failed to take every reasonable action needed to prevent, mitigate, avoid or diminish the Recall or the claimed Loss. Accordingly, there is no coverage under the Policy due to the Defendants' failure to comply with Condition N.

## SECOND CAUSE OF ACTION
**(Declaratory Judgment: Recission of the Policy)**

50. Plaintiff hereby incorporates and re-alleges the preceding allegations as if fully set forth herein.

51. Despite knowing of repeated instances of metal non-conformity and contamination, Defendants stated on the Application for the Policy that they had no knowledge of any situation which could give rise to a claim under the Policy.

52. This representation was incorrect when it was made and constituted a material misrepresentation under N.Y. Insurance Law §3105.

53. Moreover, after submitting the Application, Defendants became aware of additional information concerning instances of metal non-conformity and contamination in their products which they were obligated to immediately disclose to Allied World but Defendants failed to do so.

54. Defendants' misrepresentations and omissions in connection with the Application were misleading and material under N.Y. Insurance Law §3105.

13

55. Defendants submitted the Application knowing and expecting that Allied World would rely on its representations.

56. Allied World justifiably relied on the representation made in Defendants' Application in determining whether to issue the Policy under the terms provided and in determining the appropriate premium to be charged.

57. If the true facts had been known, Allied World would not have issued the Policy and/or would not have provided coverage under the same terms or with respect to the hazard resulting in the claims at issue.

58. Therefore, Allied World is entitled to a declaration that the Policy is rescinded and void *ab initio*. Allied World is also entitled to an Order permitting it to return to Defendants the premium paid in connect with the Policy.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff reserves the right to assert additional grounds for its denial of coverage under the Policy, and prays that the Court issue judgments as follows:

1. A declaration that all claims for coverage under the Policy for Loss arising out of or in connection with the Recall are barred by the terms and conditions of the Policy;

2. A declaration that the Policy is rescinded and void *ab initio* and permitting Allied World to return to Defendants the premiums paid in connection with the Policy; and

3. For such other relief as the Court deems just and equitable.

Dated: November 13, 2023
       New York, New York

                                                Respectfully submitted,

                                                */s/William J. Brennan*
                                                **KENNEDYS CMK, LLP**
                                                Christopher C. Novak
                                                William J. Brennan
                                                Martin R. West II
                                                570 Lexington Avenue, 8th Floor
                                                New York, New York 10022
                                                212.252.0004
                                                Christopher.Novak@kennedyslaw.com
                                                William.Brennan@kennedyslaw.com
                                                Martin.Martin@kennedylaw.com

                                                *Attorneys for Plaintiff*
                                                *Allied World Surplus Lines*
                                                *Insurance Company*